NICOLA T. HANNA
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
PUNEET V. KAKKAR (Cal. Bar No. 259816)
Assistant United States Attorney
OCDETF Section
     1400 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-5728
     Facsimile: (213) 894-0142
     E-mail:    puneet.kakkar@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | 2:17-CR-00738-R |
|---|---|
| Plaintiff, | SENTENCING POSITION |
| v. | Hearing Date: June 11, 2018 |
|  | Hearing Time: 10:00 a.m. |
| THERESA TETLEY, | Location:    Courtroom of the |
|   aka "Bitcoin Maven," |              Hon. Manuel L. Real |
| Defendant. |  |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Puneet V. Kakkar, hereby files its sentencing position.

    This sentencing position is based upon the attached memorandum

///

///

of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: June 4, 2018	Respectfully submitted,

NICOLA T. HANNA
United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division


        /s/
PUNEET V. KAKKAR
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                              PAGE

TABLE OF AUTHORITIES...................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES....................................1

I.   INTRODUCTION.......................................................1

II.  BACKGROUND ON UNLICENSED MONEY TRANSMITTING BUSINESS AND
     BITCOIN............................................................2

     A.   Unlicensed Money Transmitting Businesses......................2

     B.   Background on Digital Currency and the Dark Web...............4

     C.   Digital Currency and Money Transmitting.......................6

III. OFFENSE CONDUCT....................................................7

     A.   Unregistered Money Transmitting Business......................7

     B.   Facilitation of Money Laundering..............................7

          1.   Transactions with Undercover Agents......................7

          2.   Exchanges for William James Farber.......................9

IV.  DEFENDANT SHOULD BE SENTENCED TO 30 MONTHS' INCARCERATION..........9

     A.   Nature and Circumstances of Offense...........................9

     B.   Need to Promote Respect for the Law and to Afford
          Adequate Deterrence..........................................11

     C.   History and Characteristics of Defendant.....................12

V.   CONCLUSION........................................................13

**TABLE OF AUTHORITIES**

DESCRIPTION                                                          PAGE

Cases

United States v. Faiella,
   39 F. Supp. 3d 544 (S.D.N.Y. 2014)........................ 6, 7, 8, 9
United States v. Murgio,
   209 F. Supp. 3d 698 (S.D.N.Y. 2016).............................. 2

Statutes

18 U.S.C. § 3553(a).................................................. 9
18 U.S.C. § 1960............................................. 1, 2, 3, 6
31 U.S.C. § 5318(g)(1)............................................... 3
31 U.S.C. § 5330..................................................... 2
31 U.S.C. §§ 5318(a)(2).............................................. 3

Regulations

31 C.F.R. § 1010.100(ff)(5).......................................... 6
31 C.F.R. § 1010.100(t).............................................. 6
31 C.F.R. § 1010.311................................................. 3
31 C.F.R. § 1022.210(a).............................................. 3
31 C.F.R. § 1022.380(b)(2)........................................... 2
31 C.F.R. § 1022.320(a)(2)........................................... 3

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

Over the course of more than three years, defendant Theresa Tetley, also known as "Bitcoin Maven" ("defendant"), operated an illegal, unlicensed money transmitting business, namely, an unregistered Bitcoin-for-cash exchange service, which fueled a black-market financial system in the Central District of California that purposely and deliberately existed outside of the regulated bank industry.  Defendant's decision to not register with the federal government signaled to her clients that she was unconcerned with the government's regulations concerning money laundering, and thereby would not conduct customer due diligence or report to the government suspicious transactions or certain transactions over $10,000. Customers, regardless of the source of their funds, could then utilize her services, exchange Bitcoin for cash or vice versa, without fear of being the subject of reports filed with the federal government for certain transactions that otherwise would be reported. Defendant charged a premium to these customers seeking to avoid the regulated financial system, and collected higher fees for her services than those charged by regulated exchangers.  For this conduct, defendant has pleaded guilty to 18 U.S.C. §§ 1960 and 1956(a)(3).

The government recommends the Court to sentence defendant to 30 months' incarceration, to be followed by three years of supervised release.

## II. BACKGROUND ON UNLICENSED MONEY TRANSMITTING BUSINESS AND BITCOIN

### A. Unlicensed Money Transmitting Businesses

18 U.S.C. § 1960 criminalizes, in relevant part, money transmitting businesses that fail to comply with federal registration requirements, as required by 31 U.S.C. § 5330 and the regulations prescribed thereunder. Section 1960 was enacted in 1992 as part of the Annunzio-Wylie Anti-Money Laundering Act, which was one of a series of provisions aimed at combating money laundering and enhancing reporting requirements relating to cash transactions. A more complete explanation of the purpose of the legislation is in the report of the Senate Banking Committee on the bill in the prior session of Congress. See S. Rep. No. 101-460, 101st Cong., 2d Sess. (1990). That Senate Report noted that, as banks' compliance with money laundering legislation has improved, "[i]ncreasingly, money launderers are using money transmitters, check cashers, money exchanges and other nonbank financial companies" to "convert street currency into monetary instruments and even to transmit abroad the proceeds of drug sales." Id. at 13-14. "From its inception," Section 1960 "sought to prevent innovative ways of transmitting money illicitly." United States v. Murgio, 209 F. Supp. 3d 698, 708 (S.D.N.Y. 2016).

A money transmitting business must usually register with the federal government as a "money services business," specifically, with the Financial Crimes Enforcement Network ("FinCEN"), which is part of the Department of Treasury. 31 C.F.R. § 1022.380(b)(2). Registration as a "money services business" ("MSB") then triggers obligations for that financial institution. For example, under the

Bank Secrecy Act, an MSB is required, among other things, generally to:

- Develop, implement, and maintain an effective written anti-money laundering program that is reasonably designed to prevent the MSB from being used to facilitate money laundering and the financing of terrorist activities (31 U.S.C. §§ 5318(a)(2), (h); 31 C.F.R. § 1022.210(a));
- Report transactions that the MSB knows, suspects, or has reason to suspect are suspicious (which includes funds derived from illegal activity or involves the use of the transmitter to facilitate criminal activity), if the transactions are conducted or attempted by, at, or through the MSB, and the transactions involve or aggregate to at least $2,000 in funds or other assets (31 U.S.C. § 5318(g)(1); 31 C.F.R. §§ 1022.320(a)(2)); and
- File a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such MSB which involves a transaction in currency of more than $10,000 (31 C.F.R. § 1010.311).

In practice, the obligations outlined above require an MSB to verify customer identity, conduct due diligence on its customers, file reports with the federal government, and create and maintain records pursuant to the Bank Secrecy Act.  When MSBs are not registered with the federal government, they are not routinely subject to examinations (i.e., audits) conducted by FinCEN to ensure that these obligations are being followed, and have no incentive to comply with the requirements of the Bank Secrecy Act.  Unregistered MSBs thus operate in, and fuel, a black market financial system, and

pose the very threats that the Senate outlined in legislating 18 U.S.C. § 1960.

**B.   Background on Digital Currency and the Dark Web**

Digital currency (also known as crypto-currency or virtual currency)[1] is generally defined as an electronic-sourced unit of value that can be used as a substitute for fiat currency (i.e., currency created and regulated by a government).  Digital currency exists entirely on the Internet and is not stored in any physical form.  Digital currency is not issued by any government, bank, or company and is instead generated and controlled through computer software operating on a decentralized peer-to-peer network.  Digital currency is not illegal in the United States and may be used for legitimate financial transactions.  However, because of the "pseudonymous" nature of digital currency (described below), it is used for conducting illegal transactions, such as the sale of controlled substances.

"Bitcoin" (or "BTC") is a type of online digital currency that allows users to transfer funds more anonymously than would be possible through traditional banking and credit systems.  Bitcoins are a decentralized form of digital currency having no association with banks or governments.  Users store their Bitcoins in digital "wallets," which are identified by unique electronic "addresses."  A digital wallet essentially stores the access code that allows an individual to conduct Bitcoin transactions on the public ledger.  To access Bitcoins on the public ledger, an individual must use a public address (or "public key") and a private address (or "private key").

---

[1] For purposes of this filing, "digital currency," "crypto-currency," and "virtual currency" address the same concept.

The public address can be analogized to an account number while the private key is like the password to access that account.  Even though the public addresses of those engaging in Bitcoin transactions are recorded on the public ledger, the "Blockchain," the true identities of the individuals or entities behind the public addresses are not recorded.  If, however, a real individual or entity is linked to a public address, it would be possible to determine what transactions were conducted by that individual or entity.  Bitcoin transactions are, therefore, described as "pseudonymous," meaning they are partially anonymous.

Although they are legal and have known legitimate uses, Bitcoins are also known to be used by criminals for money-laundering purposes, and are believed to be the most oft-used means of payment for illegal goods and services on "dark web" websites.  "Dark web" websites is a colloquial term for sophisticated, encrypted websites that allow participants to buy and sell illegal items, such as drugs, firearms, and other hazardous materials (sold by "vendors") with greater anonymity than the traditional Internet.  These online black market websites use a variety of technologies, and other encryption technologies, to ensure that communications and transactions are shielded from interception and monitoring, and usually only accept digital currencies such as Bitcoin as a form of payment for contraband.  A famous dark web marketplace, Silk Road (which law enforcement shut down in 2013), operated similar to legitimate commercial websites such as Amazon and eBay, but offered illicit goods and services.

Generally, individuals can purchase or sell Bitcoin in a peer-to-peer context (i.e., another individual willing to exchange Bitcoin

for cash) or from exchange companies. Those offering to exchange Bitcoin for cash in a peer-to-peer setting often advertise their services on the Internet, on websites such as localbitcoins.com or Craigslist. Bitcoin exchangers either comply with the law, and register with FinCEN (like traditional banks), or choose not to register with the federal government, thereby seeking to avoid the requirements imposed by the Bank Secrecy Act.

In the government's experience with criminal investigations, those who obtain and use digital currency via and through illicit means seek to exchange this currency for fiat currency via unregistered financial exchangers to remain outside government scrutiny. That is to say, illicit actors prefer exchanging their Bitcoin for fiat currency (or vice versa) through institutions that do not require a form of identification or report certain transactions to the federal government. This method of exchanging allows illicit actors to remain as anonymous as possible.

### C. Digital Currency and Money Transmitting

Exchangers of convertible virtual currency -- those who offer the purchase and sale of U.S. dollars as well as digital currency such as Bitcoin -- are "money transmitters" as defined at 31 C.F.R. § 1010.100(ff)(5), "financial institutions" as defined at 31 C.F.R. § 1010.100(t), and generally "money transmitting business[es]" for purposes of 18 U.S.C. § 1960. See FIN-2013-G001, "Application of FinCEN's Regulations to Persons Administering, Exchanging or Using Virtual Currencies," March 18, 2013; United States v. Faiella, 39 F. Supp. 3d 544, 546 (S.D.N.Y. 2014). These exchangers are thus subject to the Bank Secrecy Act, including the requirement to implement an

6

anti-money laundering program, and its various reporting requirements described above.

**III. OFFENSE CONDUCT**

    **A.    Unregistered Money Transmitting Business**

Between 2014 and 2017, defendant operated an unlicensed money transmitting business -- the exchange of Bitcoin for cash and vice versa. (Presentence Investigation Report ["PSR"] ¶ 12.) This was, by all means, a professional business and not a hobby: She advertised under a trade name, "Bitcoin Maven," on localbitcoins.com. (PSR ¶ 13.) Defendant also maintained ledgers of her activity for customers across the country. (Id.) She possessed a money counter to ensure that she was always accurate. (Id. ¶ 31.) In the course of this illicit business, defendant exchanged a significant amount of money, between $6 and $9.5 million. (Id. ¶¶ 12, 15.)

    **B.    Facilitation of Money Laundering**

        1.    <u>Transactions with Undercover Agents</u>

Defendant operated her unregistered exchange business to afford privacy and secrecy for her clients. Defendant's interactions with undercover law enforcement provides a snapshot into the means by which she conducted her business.

In or around April 2016, an undercover with the Drug Enforcement Administration ("UCA-1") met with defendant. Defendant stated that she had been "kicked out" of four major financial institutions, and therefore had enlisted her sister to conduct cash transactions for her. (Id. ¶ 18.) UCA-1 informed defendant that she wanted to maintain anonymity with her Bitcoin transactions with defendant; and defendant, honoring this request, stated that she did not want to know the source of UCA-1's Bitcoin. (Id.)

7

In July 2016, UCA-1 then introduced defendant to UCA-1's "boyfriend," who was, in fact, another undercover agent ("UCA-2"). UCA-2 began to insinuate the unlawful nature of his funds (which were in Bitcoin), informing defendant that he was engaged in a business selling products that were not "socially acceptable on the open market." (Id. ¶ 21.) In response to this, defendant stated "I don't want to know," but continued to discuss doing business with UCA-2. (Id.) Defendant informed UCA-2 that she did not disclose to the IRS the identity of her customers, to reassure UCA-2 the secrecy by which defendant conducted her business. (Id. ¶ 22.) Defendant also advised UCA-2 that she does not generally track whether a transaction exceeds $10,000. (Id.) UCA-2 and defendant conducted a Bitcoin-for-cash transaction that day (approximately $45,000), at a restaurant; defendant provided UCA-2 with cash (in exchange for his Bitcoin) in seven white envelopes. (Id. ¶ 26.)

Defendant and UCA-2 met again in January 2017 to conduct another exchange of cash for Bitcoin that UCA-2 possessed. This time, the UCA-2 was more explicit with his representation that the source of his Bitcoin was unlawful, informing defendant that an intruder broke into one his apartments, stealing only the supply of "coke, meth, and weed" but not the money because it was in "Bitcoin." (Id. ¶ 29.) Defendant believed that the transaction involved the proceeds of unlawful activity, and in a wink-and-nod, stated "you're joking," and continued to proceed with the transaction, commenting that "Bitcoin is the way to go." (Id. at ¶ 29.) Defendant provided approximately $70,000 in seven white envelopes to UCA-2. (Id. at ¶ 30.) Defendant continued to assure UCA-2 that she was trustworthy and reputable, and UCA-2 emphasized that he was in the business of selling narcotics.

(Id. at ¶¶ 31, 32.) Notwithstanding this, defendant still decided to do business with UCA-2. (Id. at ¶ 33.)

Defendant and UCA-2 arranged to meet in March 2017 for a $300,000 exchange transaction. (Id. at ¶ 33.) Defendant brought to the transaction two Trader Joe's paper grocery bags. (Id. at ¶ 33; Plea Agreement Factual Basis.) Defendant was arrested at this transaction. (Id.)

### 2. Exchanges for William James Farber

The privacy and anonymity that defendant offered to the public attracted at least one other actor who is alleged to launder money. In the course of her business, prior to defendant's arrest, defendant exchanged over $6 million in Bitcoin for cash for one of her customers, whom she knew as "David." (PSR ¶ 15.) Defendant communicated with "David" via Wickr, an encrypted communications application. (Id.) It turns out that "David" was William James Farber, who was charged by the government in United States v. Farber, et al., 17-CR-188-LJO (E.D. Cal.), for being a large darknet vendor of narcotics on the marketplace AlphaBay, which was subsequently shut down by law enforcement. (Id.)

**IV. DEFENDANT SHOULD BE SENTENCED TO 30 MONTHS' INCARCERATION**

Based on the relevant factors that this Court can consider for sentencing, including 18 U.S.C. § 3553(a), the government recommends a custodial term of 30 months' imprisonment.

**A. Nature and Circumstances of Offense**

Defendant profited from her illicit business. Defendant operated a multi-million dollar unlicensed money transmitting business in the Central District of California, flouting regulations requiring financial institutions (such as her) to prevent money

laundering in this country. Indeed, defendant marketed, and capitalized on, providing anonymity and secrecy for her clients, exchanging Bitcoin for individuals such as Farber and the DEA undercover agents who are alleged to have obtained (or claimed to have obtained) those funds from illegal activities. Defendant offered a financial platform beyond the scope of federally regulated financial institutions to convert digital currency into fiat currency and launder transactions. And defendant did so with an intent to profit; she charged above-market rates[2], which presumably was profitable for her. During the time of the offense conduct, defendant's adjusted gross income earnings approximated, and exceeded, $300,000 per year.

    While the law does not require that defendant know that her conduct was illegal, that was the case here, which constitutes an aggravating factor for sentencing. Defendant flatly admitted to the DEA undercover agent that she had been "shut out" of financial institutions, but continued to proceed with the illicit business anyway; this should have alerted her to the inherently suspect nature of her business. Instead of ceasing these operations or complying with the law, she enrolled her sister to assist her with banking transactions.

    Further, defendant's conduct with the undercover agents demonstrate her way of business: Defendant continued to proceed conducting transactions, even when alerted that the transactions were

---

[2] For example, the fees that defendant charged were greater than those charged by Coinbase, a registered digital currency exchange institution. See, e.g., https://support.coinbase.com/customer/portal/articles/2109597-buy-sell-bank-transfer-fees.

10

suspicious, thereby consciously disregarding the anti-money laundering regulations that the federal government has imposed for financial institutions such as herself.

Defendant also facilitated the laundering of suspected narcotics proceeds, namely, those of an alleged large darknet vendor, Farber. Though the government has no direct proof that defendant was specifically aware of Farber's alleged activity, the circumstances certainly reflect that defendant knew, or should have known, of some malfeasance connected to Farber. Defendant communicated Farber via encrypted communications. For a significant period of time, she conducted numerous, high-level cash transactions with him (ultimately amounting to $6 million), knowing him only to be "David" or "Pirate Shit." These circumstances show that defendant knew something was awry, as "David" coveted that she operated entirely outside of the regulated financial market, that she offered privacy and anonymity, and that she could sustain a high level of business for him.

Providing cash in envelopes (and in the significant amounts she did), in coffee shops and restaurants, is no way to conduct legitimate business, certainly when that volume exceeds the millions, and someone such as defendant -- a former stockbroker and real estate investor -- was certainly aware of that. Her decision to continue to proceed in this manner highlights the seriousness of the offense that warrants a custodial sentence of 30 months.

**B.   Need to Promote Respect for the Law and to Afford Adequate Deterrence**

A significant sentence of 30 months is also warranted to deter individuals from operating unlicensed money transmitting businesses. In light of the growth of the dark web and the use of digital

currency, unlicensed exchangers provide an avenue of laundering for those who use digital currency for illicit purposes. Illicit actors who obtain Bitcoin from unlawful means (e.g., the sale of contraband) seek an outlet to exchange those funds for fiat cash (to reap the profits of their crime or to further layer transactions to avoid detection); unlicensed exchangers provide the perfect conduit. Unlicensed exchangers such as defendant generally do not conduct customer due diligence, file transaction reports for cash transactions in excess of $10,000, or file suspicious reports with the government. All that matters for an unlicensed exchanger is the profit--the price that a customer is willing to pay for this anonymity; for an illicit actor, that price is simply a cost of doing criminal business.

In targeting unlicensed exchangers, the government is able to prevent, or at least curb, the opportunities for actors utilizing digital currency illicitly to convert those proceeds into fiat currency. A custodial sentence of 30 months in this case will signal that failure to register as a money transmitting business is a serious offense, and not a simple administrative oversight of failing to file a form with the federal government. That is particularly the case here, where defendant facilitated laundering for a suspected large darknet narcotics vendor and agreed to launder funds represented to be narcotics proceeds with an undercover agent.

**C.   History and Characteristics of Defendant**

The defendant's history and characteristics are mitigating factors for the Court to consider. Specifically, defendant has no criminal history and no encounter with the criminal justice system. Further, defendant appears to have a caretaking, leading role in her

12

family, looking after siblings who have been affected with serious health issues. The government believes that these mitigating concerns are properly reflected in the recommended sentence. In sum, these mitigating concerns do not outweigh the significant nature of her crime (which allowed the crimes of others to continue) and the need for general deterrence, and thus, a custodial sentence of 30 months is warranted.

## V. CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court sentence defendant to 30 months' incarceration, to be followed by three years of supervised release. The government also requests an order of forfeiture reflecting (1) 40 Bitcoin that she possessed as of March 30, 2017, and transferred to law enforcement on January 8, 2018; and (2) $292,264.00 and 25 assorted gold bars seized by law enforcement officials on March 30, 2017.