1   Brian E. Klein (Bar No. 258486)
      bklein@bakermarquart.com
2   Ashley E. Martabano (Bar No. 236357)
      amartabano@bakermarquart.com
3   BAKER MARQUART LLP
4   2029 Century Park East, Suite 1600
    Los Angeles, California 90067
5   Telephone: (424) 652-7800
    Facsimile: (424) 652-7850
6

7   *Attorneys for Theresa Tetley*

8

9                  UNITED STATES DISTRICT COURT

10                 CENTRAL DISTRICT OF CALIFORNIA

11

12  UNITED STATES OF AMERICA,          | Case No.: CR-17-738-R
13              Plaintiff,
    v.
14                                      **DEFENDANT THERESA TETLEY'S**
    THERESA TETLEY,                     **SENTENCING MEMORANDUM**
15              Defendant.

16                                      Hearing Date: June 11, 2018
17                                      Hearing Time: 10 a.m.

18

19

20

21

22

23

24

25

26

27

28

INTRODUCTION ................................................................................................................. 1

DISCUSSION ..................................................................................................................... 2

1.   Sentencing Framework and PSR ................................................................. 2

2.   Theresa Tetley's Personal History and Characteristics ........................... 3

  a.   Theresa's Upbringing, Schooling, and Work History ......................... 3

  b.   Theresa and Bitcoin ................................................................................ 5

  c.   Supportive Testimonials: The Theresa Known to Family, Friends, and Others .................. 7

    i.   Theresa's Dedication to Her Family……………………………………8

    ii.   Theresa's Dedication to Her Friends……………………………………..12

3.   The Remaining 18 U.S.C. § 3553(a) Factors Support a Non-Custodial Sentence ................ 14

  a.   The nature and circumstances of the offenses ................................... 14

  b.   The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense ......................... 16

  c.   Adequate deterrence to criminal conduct ........................................... 17

  d.   Protection of the public from further crimes....................................... 17

CONCLUSION................................................................................................................. 18

1

# TABLE OF AUTHORITIES

2

3

**Cases**                                                                                 **Page(s)**

*United States v. Carty*,
   520 F.3d 984 (9th Cir. 2008) ........................................................................ 2

**Statutes**

18 U.S.C. § 1956(a)(3)(B) ........................................................................ 15

18 U.S.C. § 1960 ................................................................................ 15, 16

18 U.S.C. § 3553(a) ...................................................................... *passim*

U.S.S.G. § 2B1.1 .................................................................................. 16

**Other Authorities**

Exhibit A, *Letter from Lorraine Walton* ............................................ 3

https://www.coinbase.com/about (Last visited June 4, 2018) ............ 7

https://www.coindesk.com/price/ (Last visited June 4, 2018) ............ 6

Marc Andreessen, *Why Bitcoin Matters*, The New York Times (Jan. 21, 2014) ................ 7

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# INTRODUCTION

This is a truly sad story of a big-hearted woman who lived more than 45 years without getting into any trouble with the law until she engaged in the criminal conduct that brings her before this Court to be sentenced.

The defendant, Theresa Tetley, is now a 50-year old woman who has always been very hard-working and led a simple lifestyle, even during the time period she engaged in the criminal conduct for which she will be sentenced on June 11, 2018.  Other than the instant criminal conduct, Theresa has no prior record, and now that both her parents have passed away, she has assumed responsibility for managing the affairs of one of her three younger sisters.  That sister is developmentally delayed and has learning disabilities, making her vulnerable to being taken advantage of by unscrupulous people, including one of their other sisters who has already victimized her.  Theresa is her necessary and fierce protector.

On June 11, Theresa is being sentenced on charges that she operated a money transmission business that failed to comply with federal registration requirements and that she conducted a financial transaction involving proceeds of drug trafficking (exchanging approximately $70,000 for about 80 bitcoins, and earning her a small percentage of that as profit).  As part of a pre-indictment plea agreement, she pleaded guilty to those two crimes pursuant to an information.

Theresa's venture into the bitcoin marketplace began innocently enough as a hobby as result of a hiking friend who turned her on to it.  But to her ever-lasting regret, it later entered the realm of criminal activity when she failed to comply with federal registration requirements and laundered money during three deals with undercover law enforcement officials.  In March 2017, her life was forever changed when law enforcement arrested her and seized items from her.

Since that fateful day, Theresa has taken full responsibility for her actions, including pleading guilty pre-indictment and agreeing to significant forfeiture.  The overwhelming evidence shows that Theresa, but for the instant criminal conduct, has exceptionally strong character.  Those who know her best – including over 20 letter writers – attest to her core goodness and kind heart. She has earned by her actions, including post-arrest actions, an exercise of leniency.  Theresa

DEFENDANT THERESA TETLEY'S SENTENCING MEMORANDUM

1  acknowledges that she acted improperly, accepts full responsibility for her actions, is deeply

2  remorseful, and will personally address the Court at the sentencing on these matters.

3       But before Theresa does, the Court will read below and in the attached letters about her

4  genuine remorse and kind-hearted nature, even after having to deal with a short and abusive

5  marriage. The letters from family, friends, and others who have known Theresa supply a full – and

6  very positive – picture of her, showing how committed she is to moving forward in her life with

7  resolve to never again take actions like those that have put her before this Court for sentencing.

8       Theresa stands before this Court to be sentenced as a non-violent, first-time offender.

9  Below are the many compelling reasons based on the factors set forth in 18 U.S.C. § 3553(a) that a

10  sentence significantly below both the uncontested advisory guidelines range of 46 to 57 months

11  imprisonment and the government's recommendation of 30 months imprisonment is warranted.

12  Those reasons revolve around the totality of who Theresa is; who she can still be; her acceptance of

13  responsibility; and a number of unique circumstances. The Court should sentence Theresa to no

14  more than a year and one day of prison;[1] however, in light of her important care for one of her

15  sisters, a sentence of probation with community service is warranted.

16                             **DISCUSSION**

17     **1.**   **Sentencing Framework and PSR**

18       The advisory sentencing guidelines are merely "one factor among the § 3553(a) factors that

19  are to be taken into account in arriving at an appropriate sentence." *United States v. Carty*, 520

20  F.3d 984, 991 (9th Cir. 2008). "[T]he history and characteristics of the defendant" are considered

21  alongside "the nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). "The overarching

22  statutory charge for a district court is to 'impose a sentence sufficient, but not greater than

23  necessary' to reflect the seriousness of the offense, promote respect for the law, and provide just

24  punishment; to afford adequate deterrence; [and] to protect the public. . . " *Carty*, 520 F.3d at 991.

25

26

27

28  [1] Because only sentences of more than one year permit federal prisoners to obtain early release for good time while incarcerated, if the Court sentences below one year and one day (which the defense believes it should), the next highest sentence should be no more than 310 days of prison time.

DEFENDANT THERESA TETLEY'S SENTENCING MEMORANDUM

The PSR has calculated an advisory guidelines total offense level of 23, resulting in a sentencing range of 46 to 57 months.  Nonetheless, the government has recommended a term of 30 months imprisonment.  Given certain of the § 3553(a) factors, however, the Court has a strong basis to impose the defense's recommended sentence, which is sufficient but not greater than necessary to address all goals of sentencing.

**2.  Theresa Tetley's Personal History and Characteristics**

Pursuant to 18 U.S.C. § 3553(a)(1), in arriving at a sentence that is "sufficient but not greater than necessary" to comply with the purposes of federal sentencing, the Court "should consider the nature and circumstances of the offense and *the history and characteristics of the defendant*."  (Emphasis added.)  The latter considerations are addressed by: (1) a brief overview of Theresa's life and; (2) the words and voices of the many people who have come forward to write the Court letters regarding their knowledge of her many admirable qualities and good deeds.

**a.  Theresa's Upbringing, Schooling, and Work History**

Theresa was born in Burlington, North Carolina, and then she was raised, along with her three younger sisters, in Virginia by their parents Janet and Curtis.  (PSR ¶¶ 67-69.)  Her father was a bookkeeper and her mother was an administrative assistant. ( *Id.*)  Curtis passed away in 2005, and Janet only recently passed away in 2016.  (*Id.*)

Theresa's sisters are Donna, Eileen, and Cynthia.  (*Id.* ¶ 70.)  She has been their caretaker since a young age (*e.g.,* babysitting them at age 9).  When their mother returned to work,

> Theresa became the "soccer mom" and after-school caregiver to the younger girls, including Eileen, who has several learning disabilities (known as non-Down Syndrome Mental Retardation) and presented additional challenges for her sisters.  Despite everything, Theresa always took on responsibilities beyond any reasonable expectations and has steadfastly supported her family unconditionally.

(Exhibit A, Letter from Lorraine Walton (Aunt of Theresa)). Donna is the second oldest sister.  She suffers from serious mental health issues and has been in and out of jail since 2011 as a result.

3

(PSR ¶¶ 70, 74.)  She has been a constant drain on the entire family.  Eileen, the next oldest, is severely learning disabled and was almost entirely dependent on their mother (with Theresa's assistance) as a caretaker until Janet died in 2016.  (*Id.* ¶¶ 72-73.)  Eileen now lives alone, but she requires close financial supervision.  Her own sister, Donna, who suffers from bipolar depression and is currently restrained from seeing Eileen, has taken advantage of Eileen as soon as she found a vulnerable moment.  (*Id.* ¶ 74.)

Eileen depends on Theresa extensively, calling or texting Theresa despite having a compensated in-home caregiver, for "all manner of questions. . . such as 'what time is it when daylight savings time begins,' or 'how do you write a check,' or 'what time do I need to get up for my doctor appointment scheduled for Noon?"  Obviously, she is vital to Eileen's sense of security and stability."  (Exhibit A, Letter of L. Walton.)  Despite living across the country, Theresa oversees Eileen's finances, and she expects to be financially responsible for her when the less than $60,000 that remains of Eileen's inheritance runs out, which could be soon.  Theresa got involved with bitcoin as a way to save money to be able to live modestly and help provide for Eileen.

Theresa's youngest sister Cynthia is married and has lived in Los Angeles with her wife since the fall of 2015.  (PSR ¶ 70.)  Theresa and Cynthia have a strong relationship.

Growing up and to this day, Theresa has always been a hard worker – working dozens of jobs over the years.  She has worked constantly since the age of 9, when she began caring for neighborhood children.  She began babysitting more widely at age 11, and took on a paper route for the Washington Post at age 13 through high school.  After turning 14, she worked at her father's bookkeeping office doing word processing and data entry when she was not in school or caring for her sisters.  She did all of this to save money for college.  She won a scholarship from the Washington Post for being one of their "bright young minds" and from her high school for being the

student who was always willing to help the school and other students in any capacity. Theresa worked two to three jobs every summer during college to pay her own way.

In 1989, Theresa received a Bachelor of Arts Degree in Theater and Speech from William and Mary. (*Id.* ¶ 89.) She then received a scholarship to attend the prestigious Julliard School in New York City for theater costumes in a one-year certificate program that she completed.

Theresa moved on from the theater business into miscellaneous jobs in New York for several years before moving to New Mexico at the end of 1995 so that her then-husband David Eltman could attend pharmacy school. She met David in May 1994, and they married in October 1995. (*Id.* ¶ 76.) David was emotionally abusive and threatened physical abuse. (*Id.*) Eventually, things had worsened with her husband to the point that she obtained a restraining order against him. They divorced in 1998. (*Id.*) She was suicidal and sought mental health help, checking herself in for psychiatric treatment in New Mexico for approximately a two-week period. (*Id.* ¶ 86.)

In 2002, Theresa moved to Los Angeles, where she has resided since. (*Id.* ¶¶ 78.) She is single and lives a modest and simple lifestyle. Much of what she owns was bought at thrift stores or on Craigslist. She has only owned two cars in her life, neither of which was new when purchased. After a car accident with her last car in August 2015, she decided not to buy another one, so she is reliant on public transportation, friends, and ride sharing services.

She currently rents a one bedroom apartment in Marina del Rey and continues to live a modest lifestyle, trying to save money for retirement and for Eileen's continued care.

### b. Theresa and Bitcoin

Theresa's interest in bitcoin began when a friend told her about it on hikes in 2013. From there, she spent time studying bitcoin and came to understand that bitcoin and the underlying blockchain technology had the potential to positively impact the world.

Her belief has been more than borne out. Bitcoin has enjoyed a meteoric rise since its inception in 2009 because of its groundbreaking nature. As a result of its widespread acceptance

5

and legitimate usage in the United States and abroad, bitcoin has a total market cap of approximately $130 billion.[2]  Noted Silicon Valley venture capitalist and co-author of the first Internet browser, Marc Andreessen, had this to say about bitcoin's importance:

> Bitcoin at its most fundamental level is a breakthrough in computer science – one that builds on 20 years of research into cryptographic currency, and 40 years of research in cryptography, by thousands of researchers around the world.[3]

Bitcoin solves the problem "of how to establish trust between otherwise unrelated parties over an untrusted network like the Internet" through the blockchain technology it employs to record transactions.[4]  Solving this problem permits one to transfer any type of digital information in a quick, secure, and verifiable fashion anywhere in the world.  The ownership and transfer of stock, bonds, homes, healthcare documents, and other types of records could be recorded on a public (or private) blockchain, eliminating the need for third-parties and drastically reducing the expenses and redundancies that plague current verification systems.  People, companies (including IBM and NSADAQ), and even governments around the world are therefore racing to build these applications.

Because of its groundbreaking nature, venture capitalists like Andreessen have poured money into bitcoin and blockchain technology-related companies.  Billions has been invested through present.  For example, Coinbase, which is one of the largest U.S.-based digital currency companies, has raised $217 million, including from numerous respected venture capital firms (valuing the company at $1 billion), and it has over 20 million users, and tens of thousands of merchants accepting bitcoins via its payment network, including Dish Network, Expedia, and Overstock.com.[5]

---

[2] https://www.coindesk.com/price/ (Last visited June 4, 2018).
[3] Marc Andreessen, *Why Bitcoin Matters*, The New York Times (Jan. 21, 2014), https://dealbook.nytimes.com/2014/01/21/why-bitcoin-matters/?mcubz=0.
[4] *Id.*
[5] https://www.coinbase.com/about (Last visited June 4, 2018).

6

Eventually, Theresa setup a listing to exchange bitcoins on LocalBitcoins.com, a local marketplace used around the world where visitors could buy and sell bitcoins from sellers in their community similar to eBay or Craigslist.  These in-person transactions eliminated the one to two week delays typical of online transactions at the time since there were no money transfer delays.  As a result, the exchange fees charged on LocalBitcoins.com are often higher than other places.

Starting in or around January 2014, she advertised on LocalBitcoins.com under the user name "Bitcoin Maven."  She did not conceal her real identity from those she met in-person to conduct transactions, including the undercover agents who arrested her.  She was easy to locate, including for law enforcement, having traded openly as "Bitcoin Maven" for a long period of time on Localbitcoins.com, which referred people to that Yahoo email address and a Google voice number.  She almost always met the counterparties in public places like Starbucks.  She did not use code words in communications and gave her real name when asked.  She did not exchange bitcoins for U.S. dollars or vice-versa on dark market websites.

### c.  Supportive Testimonials: The Theresa Known to Family, Friends, and Others

Attached as Exhibits A and B, respectively, are letters to the Court from 21 people who know Theresa well, including her family members (Exhibit A) and close personal friends and colleagues (Exhibit B).  Despite her arrest and the burdens it has imposed on them, Theresa's close family remains 100% supportive.  She is deeply remorseful for the burdens and heartache her arrest has placed and will place on them if incarcerated.  Her special relationship with her sister Eileen warrants particular consideration.

Exhibit B is comprised of moving letters from 14 people from other quarters of Theresa's life, including schoolmates, co-workers, mentors, and friends she has met through her careers, life coaching, hobbies and other activities.  As the Court will read, they all respect Theresa despite what has happened here and are eager to welcome her back with open arms as a support network when

her sentence is completed.  They view society as better with her in it and strongly believe she is remorseful for her actions and will never do anything like this again.

Collectively, the letters leave no doubt that despite the crimes she has committed, Theresa has consistently touched and inspired people around her, and those individuals have not forgotten or abandoned her.  They will be there for her when she emerges from this period in her life to start her life anew, and she is committed to not letting them down.  Theresa's care for others is something that has been a common thread throughout her life.  She is eager to return to being a close friend and family member able to support those in her life when she puts this behind her.

### i.  Theresa's Dedication to Her Family

The letters from Theresa's sisters – Cynthia Rena and Eileen Tetley; aunts – Lorraine Walton, Regina Vaccaro, and Dorothy Tetley; uncle, Andrew Drance; and cousin, Rose Mansell, speak volumes of the depths of Theresa's character and willingness to sacrifice for others.  Her aunt, Lorraine Walton, describes Theresa as "the most selfless person I've ever known," and "a joy to be around."  (Exhibit A. Letter of L. Walton)

Theresa's family members describe a loving person of outstanding character—someone who helps those near and far, family and stranger alike.  Her sister Cynthia writes:

> Theresa has been my guide, teacher, protector, and nurturer during many times in my life. I owe her a great deal of gratitude for all she has taught me and I deeply respect her desire to help others in times of crisis. Theresa's life has not been an easy road, but she always learns from her experiences and is determined to do better, be better, and share that knowledge with others, for the purpose of easing their suffering and helping them to live more fulfilling lives. . . .
> What I would like to convey is that Theresa is special person who does everything she can to help the people she cares for, not only in her personal circle of family and friends, but also for the community-at-large. Theresa has spent years volunteering at hospitals, both as a general volunteer and as a baby cuddler; at nursing facilities, providing companionship and singing with the residents; and coordinating numerous clothing and can food drives for the homeless and less fortunate. She is kind to those who others

8

might prefer to walk away from. When living in New York City, she regularly gave food to the homeless people she encountered on the street, and always gave a smile and a "Have a nice day" to those other people might ignore.

Admittedly, the last several years have been the most trying and exhausting of Theresa's life.  Since the passing of our mother, a tremendous responsibility was put on Theresa's shoulders as executor of my mother's estate and the inferred "next-in-line" mother for our Non-Down Syndrome Mentally Retarded sister, Eileen. Theresa has spent countless hours helping Eileen understand basic tasks like reading and comprehending her mail, to more serious tasks like filing a protective order against our Bi-Polar sister, Donna, who regularly manipulated Eileen into giving her money.

There were times that Donna, due to her mental illness, threatened Theresa's life and she and I were truly scared for her safety. However, even after that episode, Theresa still bought Donna clothes, luggage, toiletries, and helped her get a post office box because Donna was incapable of maintaining a job or a residence. Theresa has had compassion for Donna, who also was a victim of child abuse, but unlike Theresa and myself, did not have the wherewithal to get help and was resistant every time Theresa tried to help her.  Even through all of this pain, Theresa still tried to help Donna in any way she could because that is who Theresa is - a loving, kind, and compassionate person.

(Exhibit A, Letter of C. Rena.)  Theresa's aunt, Lorraine Walton, ably shows why she calls Theresa the most selfless person she has ever known by providing multiple examples of how Theresa has always sacrificed for her family.  As a child, when their mother went back to work, Theresa became the "soccer mom" and afterschool caregiver to her sisters.  "Despite everything, Theresa always took on responsibilities beyond any reasonable expectations and has steadfastly supported her family unconditionally."  (Exhibit A, Letter of L. Walton.)

Later in life, without hesitation, she took several weeks off from work and flew from California to the family home to aid her ailing mother in renovating the family home to sell it.  She also fixed up the condominium that Eileen had been living in to sell that as well when it became clear that her mother could no longer manage the home and needed to move closer to work in a

home she could share with Eileen.  (*Id.*)  When their mother passed, Theresa not only arranged the funeral, but also:

> [she] spent several more weeks and hundreds of hours at the condominium, going through all of [her mother's] effects; settling her estate; and transferring numerous accounts from Janet [her mother] to Eileen [her sister]. After returning home to California, Theresa spent hours on the phone, several times a week, consoling Eileen when she was sad/crying about their mother's death; sifting through mail and e-mail messages, documents and bills; their mother's medical bills and estate affairs, as well as arranging for automatic payments for applicable bills [for Eileen].

*Id.*  Theresa's uncle, other aunts and cousin confirm her selfless nature.  They also confirm that they will continue to love Theresa and be there for her after this is behind her.  Theresa's cousin, Rose Mansell writes, "I have always considered her as my honorary big sister," and describes how Theresa was an inspiration to her when she was young on her road to becoming a professional musician.  (Exhibit A, Letter of R. Mansell.)

Theresa has even "been there" for those older than her, acting as a "source of strength" to her aunt Regina Vaccaro.  Her uncle, Andrew Drance, writes:

> We have a high regard for Theresa, and always will.  She was a rock in her family over the years, supporting her mother after her father's death, and providing both physical and moral support after her mother began to have health problems for many years.  In talking with Theresa, I heard her remorse for her actions through her tears…. I believe firmly that she regrets her actions, not simply because of the consequences, but because her actions do not comport with the person that she really is.

(Exhibit A, Letter of A. Drance.)  Her aunt, Dorothy Tetley confirms Theresa's dedication to her family, her life of hard work, and how Theresa has "expressed shame and regret for what has led to this case."  (Exhibit A, Letter of D. Tetley.)  Theresa is a loving, generous person who deeply regrets her actions and will never commit another crime.

Theresa's unique family circumstances warrant further explanation, particularly her relationship with her sister, Eileen.  As noted, her sister Eileen has non-Down Syndrome Mental

DEFENDANT THERESA TETLEY'S SENTENCING MEMORANDUM

Retardation, and although she holds a job as assisting school children on the school bus, she does not understand the concept of money (including not knowing the difference between one dollar and 100 dollars), and is susceptible to fraud.  In fact, as described by Theresa's aunt, Lorraine Walton, when Theresa's mother was unconscious in the hospital after collapsing during a dialysis appointment, Theresa's bipolar sister, Donna, who was in a "relatively stable mental state" and accompanied their mother to the hospital along with Eileen:

> [C]oerced Eileen into accompanying her to Eileen's bank to withdraw money from Eileen's account for her.  This was exactly the type of behavior that my sister and nieces were concerned about in the event of Janet's death.  When they got word that their mother was in the hospital and unconscious, Theresa and Cynthia flew to her bedside in Virginia from their homes in California.  Once they arrived, Donna impersonated my sister to increase the limit on her credit card, booked a flight to California and left town, knowing full well that their mother was not going to recover.

(*Id.,* Letter of L. Walton)  As expected, Theresa's mother died only a week later.  Theresa handled the funeral arrangements, acted as executor to her mother's will, and as co-trustee of the account set up with her mother's assets to care for Eileen.  At the time, Cynthia and Theresa were co-trustees, but Cynthia has since withdrawn as a trustee, leaving Theresa as the sole trustee and party responsible for managing Eileen's meager income and support.

In addition to managing Eileen's finances:

> In the aftermath of their mother's passing, Theresa was also dealing with the real threat of Donna being "on the loose."  Donna had made her way back to Virginia, and Theresa spent countless hours trying to coordinate safety measures for Eileen, fearing not only for Eileen's safety but also for her own, after receiving death threats from Donna.  It was an around-the-clock threat, and there were multiple middle-of-the-nights [*sic*] calls from Eileen and calls to the police in an effort to keep her safe. Over several month, Theresa worked to get a protective order for Eileen against Donna, which was finally signed earlier this year.

DEFENDANT THERESA TETLEY'S SENTENCING MEMORANDUM

(*Id.*)  Eileen provided a handwritten letter that confirms how much Theresa helps her:

> Theresa has helped me a lot sine [*sic*] my mom died.  She has help
> me to protect me from my sister Donna and helped me get a
> protective order so I don't have to see Donna or talk to her again.
> She helps me try to eat better and chew slowly and she explains
> how to use my CPAP machine.  She helps me with my mail and
> checks my bank accounts and helps me pay bills and write
> checks."  She helps me sometimes when I don't know what to do
> about something like getting my glasses fixed or when the wifi
> doesn't work.  She helps me tell my doctor what I am suppsed [*sic*]
> to say.

(Exhibit A, Letter of E. Tetley.)  Her grammar and handwriting is that of a child, but her message is

clear.  Theresa helps her in every aspect of her daily life.  Although the family has had to

compensate a live-in caregiver for Eileen to manage a recent diagnosis of Crohn's Disease,

"Theresa remains the 'go-to' person" for Eileen and as noted above, is "vital to Eileen's sense of

security and stability."  Incarcerating Theresa would seriously destabilize Eileen for the entirety of

Theresa's incarceration, and would risk further harm by Donna should she somehow gain access to

Eileen without the restraining order being enforced.

### ii.  Theresa's Dedication to Her Friends

As Jack Banks, a friend of Theresa's for over 15 years wrote, Theresa's "raison d'etre for

living is helping people."  (Exhibit B, Letter of J. Banks.)  This is apparent in all of her letters of

support.

Many of her friends view Theresa as their go-to person as well.  She manages to make

quality time for everyone.  Her friend of over 30 years, Laura Carson, writes:

> I am a single woman with no husband or children and both parents
> have died.  I don't state it lightly when I say, if anything disastrous
> were to occur in my life, Theresa would be one of my first calls.
> In fact, I have the initials I.C.E. by her name in my cell phone.  "In
> Case of Emergency," I would want Theresa Tetley by my side,
> helping me get through whatever life might send my way.
>
> … Theresa has always given so much good to the world and I have
> no doubt, will continue to do so.  If our justice system seeks the

12

betterment of society, I believe our society is improved if Theresa
is sentenced to continue her positive work through acts of service
as opposed to the act of time served.

(Exhibit B, Letter of L. Carson.)  Andrea Ruston, a friend of over 10 years whom she met through a

book club, provides extensive detail about Theresa's character.  She explains how the two met, and

how Theresa is also her go-to person:

I am writing to you to express my sincere, deep, and abiding
admiration, love and respect for Theresa despite the severity of the
crimes she is taking responsibility for.…  She's who I call when
I'm sick, or really upset about anything – to talk it through,
brainstorm alternative ways of looking at it, go to a higher, more
spiritual truth about the matter, do some energy healing, or tune in
to what love would do.  That's the function that I fulfill for all of
my friends and family, including Theresa, *but Theresa is the only
person I know who I can always turn to when I need that kind of
support for myself.*

.… There isn't another living soul on the planet (that I know of)
who is as talented at helping me work through whatever is
troubling me as Theresa is.

(Exhibit B, Letter of A. Ruston (emphasis added).)  Norma Eckroate, who has known Theresa for

over 10 years writes:

Theresa has been a loving, steady and supportive friend as long as
I've known her.  In recent years, the mild cerebral palsy that I have
had since birth has become much more challenging to deal with.
Because of my physical challenges, I haven't gone out very much
in recent years – and I have been greatly appreciative of Theresa's
frequent visits to me in my home, as well as her frequent phone
calls.  She is always uplifting and a bright ray of sunshine in my
life.  I have always found Theresa to be totally honest and
trustworthy and a loving friend.

(Exhibit B, Letter of N. Eckroate.)  John Petz, a friend of Theresa's who has known her only for

more than 6 years writes:

I can honestly say that I have personally found her to be one of the
most straightforward, dependable, hard-working and giving people
I have ever met.  On numerous occasions she has used her
considerable coaching skills to help me work through personal or
professional challenges.  Even during her legal difficulties, she has

13

> consistently risen above her own fears and has given kindly to
> myself and others.
>
> … While she can't undo the mistake she has made, I know how
> deeply this has affected her, and I know that she will never break
> the law again.

(Exhibit B, Letter of J. Petz.)  Her letters of support also make clear that Theresa deeply regrets her

actions, which were out of character for her, and will never do this again.  As Mr. Banks wrote,

"This case is an aberrant blimp [*sic*] on the long arc of her life which has been all about helping

others. . .  I am sure that with gracious leniency, Teresa [*sic*] will continue her journey with greater

humbleness and self-reflection while making positive contributions to all who come into contact

with her."  (Exhibit B, Letter of J. Banks.)  This is her first – and it will be her last – involvement

with the criminal justice system.

### 3.   <u>The Remaining 18 U.S.C. § 3553(a) Factors Support a Non-Custodial Sentence</u>

In arriving at a sentence, that is "sufficient but not greater than necessary" to comply with

the purposes of federal sentencing, the Court needs to consider a number of other factors, including:

(1) the nature and circumstances of the offense; and (2) the need for the sentence imposed (a) to

reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment

for the offense, (b) to afford adequate deterrence to criminal conduct, and (c) to protect the public

from further crimes of the defendant.  18 U.S.C. § 3553(a).  The following is a discussion of how

those factors, the most relevant ones here other than Theresa's personal history and characteristics

discussed above, support the defense's requested sentence.

### a.   The nature and circumstances of the offenses

The nature and circumstances of the offenses weigh strongly in favor of the requested

probationary sentence.  Theresa acknowledges that she engaged in criminal conduct and is guilty of

serious criminal offenses, federal felonies.  In this case, she pleaded guilty to violating 18 U.S.C.

DEFENDANT THERESA TETLEY'S SENTENCING MEMORANDUM

§ 1960(a) and (b)(1)(B) through her operation of a money transmission business for a little over three years that failed to comply with federal registration requirements.  The federal government depends on those operating such businesses to register and fulfill all the related requirements so it can, among other things, monitor for money laundering.  She also pleaded guilty to money laundering in violation of 18 U.S.C. § 1956(a)(3)(B).  During 2016 and 2017, she engaged in three transactions with undercover federal agents in which U.S. dollars were exchanged for bitcoins.  During this time, Theresa departed from a lifetime of integrity and good deeds and showed terrible judgment by failing to comply with federal registration requirements and buying bitcoins from individuals who represented themselves as engaged in criminal activity.

Theresa does not dispute the importance of the laws she violated, and she sincerely regrets her illegal conduct.  That said, it bears pointing out these are non-violent crimes, and there are no allegations that she defrauded or stole money from anyone, let alone vulnerable victims.

Moreover, the evidence shows that Theresa's approach to her bitcoin trading was anything but sophisticated.  This is important because it helps demonstrate, among other things, that she did not set out to engage in a broad-ranging criminal enterprise.  She was easy to locate, including for law enforcement, having traded openly for a long period of time on Localbitcoins.com under the name "Bitcoin Maven," which referred people to that Yahoo email address and a Google voice number.  She almost always met the counterparties in public places like Starbucks.  She did not use code words in communications and gave her real name when asked.  As renowned former criminal defense attorney John Condon, Jr. would say, "[Sh]e left a trail a Boy Scout could follow."  Again, this in no way excuses her crimes, but it places them in the proper context and show, among other things, that she will not re-offend.

DEFENDANT THERESA TETLEY'S SENTENCING MEMORANDUM

It is also noteworthy that Theresa did not live lavishly as a result of her bitcoin dealings. She did not spend money on expensive jewelry, homes, boats, cars or the like. She lived modestly in an apartment she rented.

### b. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense

The advisory guideline sentence range of 46 to 57 months exacts too high a price in Theresa's case. This is due to the high guidelines loss range of $3.5 to $9.5 million calculated under U.S.S.G. § 2B1.1. Out of the total of 26 guidelines points calculated by the parties and the PSR, no fewer than 18, or more than two-thirds of the total, are the product of that loss range, per § 2B1.1(b)(J). The defense agrees those are the proper guidelines and loss ranges; however, that loss range and therefore the resulting sentencing range do not comply with the purposes set forth in § 3553(a), including reflecting the seriousness of the offenses and providing just punishment for the offenses. A significantly lower sentenced is called for.

The loss range of $3.5 to $9.5 million is based on an estimated loss amount tied to the amount of bitcoins and dollars she exchanged as an unlicensed money transmitter in violation of 18 U.S.C. § 1960. It does not, however, reflect any loss of money by Theresa's customers or anyone else – rendering the word "loss" a true misnomer as it relates to what actually transpired under § 3553(a). This supports a sentence below the guidelines range.

Further, the following example of a far more nefarious bitcoin scheme, involving a defendant who did not offer to cooperate or plead guilty pre-indictment, demonstrates a significant variance is supported here:

- Robert Faella received a 48-month sentence as a result of running an illicit bitcoin exchange on the Silk Road website for which he earned $950,000 in profits. Faella had a prior felony conviction, yet the court still imposed a sentence less than the agreed-upon guideline range of 57 to 60 months. *U.S. v. Faella, et al.*, 14-CR-243, Southern District of New York.

16

DEFENDANT THERESA TETLEY'S SENTENCING MEMORANDUM

Not only did Theresa plead guilty pre-indictment, but she also had no bitcoin dealings on any dark market website, such as the Silk Road, which Faella did.  And here is another example of a defendant who did not plead guilty pre-indictment, whose sentence supports a significant variance here:

- John Powell also received a 48-month sentence after eventually pleading guilty to two counts of running an unlicensed bitcoin exchange that processed over $3 million during an 18-month period.  *U.S. v. Powell*, 14-CR-10037, Central District of Illinois.

### c.  Adequate deterrence to criminal conduct

Theresa's case provides more than adequate deterrence for financially-related and non-violent crimes like hers.  As part of her plea agreement that would be a deterrent to anyone considering doing what she has done, she has agreed to forfeit significant funds.  Specifically, she has already forfeited 40 bitcoins she held on the day of her arrest and $292,264 in cash and 25 gold bars (1 ounce each) the government seized that same day.  The value at the time she agreed to forfeit them about was approximately $650,000.[6]  This represents a significant level of deterrence, since people engage in the type of crimes to which she pleaded guilty to make money, and what she agreed to forfeit, approximately $1 million, is substantial.  This consequence alone serves as both a general deterrent to anyone who may be inclined to commit similar crimes and as a specific deterrent to Theresa, who never wants to go through this again.

### d.  Protection of the public from further crimes

Neither imprisonment nor other forms of custody are needed to protect the public from future crimes.  Based on her lack of criminal history and personal characteristics, Theresa poses the lowest possible risk of recidivism.  More importantly, as the letters of support attest, she has learned her lesson.  As such, Theresa presents no risk of reoffending and any form of custody is wholly unnecessary to protect the public.

---

[6] Based on the Coindesk BPI price index, on January 8, 2018, the price of bitcoin was approximately $16,094.

17

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

Theresa knows her crimes represent a tremendous failure on her part.  That said, she has accepted responsibility for her conduct (doing so pre-indictment), she is sincerely remorseful for what she has done, and she is dedicated to being a productive and law-abiding citizen when this is behind her.  All indications are that she will never do anything like this again, and can be a valuable and contributing member to society – most importantly, she can help take care of her sister Eileen, who truly needs her assistance now more than ever.  A probationary sentence with community service for Theresa would be sufficient but not greater than necessary to achieve all goals of federal sentencing.

DATED:  June 4, 2018                              Respectfully submitted,

                                                */s/ Brian E. Klein*
                                                BRIAN E. KLEIN
                                                ASHLEY E. MARTABANO
                                                Baker Marquart LLP
                                                2029 Century Park East, Suite 1600
                                                Los Angeles, California  90067
                                                Telephone: (424) 652-7800
                                                *Attorneys for Theresa Tetley*

DEFENDANT THERESA TETLEY'S SENTENCING MEMORANDUM